# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
### (Greenbelt Division)

| | |
|---|---|
| **CHAD A. LERNER**, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> vs. <br><br> **NORTHWEST BIOTHERAPEUTICS, INC.** and **LINDA F. POWERS,** <br><br> Defendants. | **No. 8:15-cv-02532-GJH** <br><br> **CLASS ACTION** <br><br> Hon. George Jarrod Hazel <br><br> **AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** <br><br> **DEMAND FOR JURY TRIAL** |

Lead Plaintiffs, Neil Pastel and Franklin Greer ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their amended complaint against Defendants Northwest Biotherapeutics, Inc. ("NW Bio" or the "Company") and Linda F. Powers ("Powers"), allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, but was not limited to, consultation with a leading expert on clinical trials and the drug approval process and a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding NW Bio, analysts' reports and advisories about the Company, clinical trial records available on the Clinicaltrials.gov website of the United States Food and Drug Administration ("FDA"), and other obtainable information. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a

reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all persons who purchased common stock in NW Bio between January 13, 2014 and August 21, 2015, both dates inclusive (the "Class Period") for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") by NW Bio and its Chief Executive Officer ("CEO"), Defendant Powers.

2.      NW Bio is a highly-promotional development stage biopharmaceutical company traded on the NASDAQ exchange under the symbol "NWBO."  Since at least the time it went public in 2001, NW Bio focused on developing dendritic cell cancer immunotherapies.  Dendritic cell immunotherapies aim to use human dendritic cells to marshal an immune response against cancerous tumors.  NW Bio did not invent dendritic cell immunotherapy, but claims to have a unique platform to create and manufacture dendritic cell immunotherapies that it calls "DCVax."

3.      The Company asserts that its DCVax platform can be applied to all cancerous tumors.  At all times relevant hereto, the Company's efforts focused on two products: "DCVax-Direct," an immunotherapy for a broad array of inoperable tumors, and "DCVax-L," an immunotherapy for operable glioblastoma brain cancer tumors.  During the Class Period, investors valued NW Bio on the prospects for these two products.

4.      Powers was formerly a global finance executive for the fraud-ridden Enron Corporation, and now serves as the Chairperson of the Board, President, CEO, Principal Financial Officer and Principal Accounting Officer at NW Bio.  Since at least 2000, Powers has also been a healthcare financier through the Toucan Group of companies that she co-founded and owns with her husband, Robert Hemphill, Jr. ("Hemphill").  Powers gained control over NW Bio in 2004 when Toucan Capital

2

Fund II and Toucan Partners injected $14.5 million into NW Bio in exchange for a series of securities that, in the aggregate, conferred them a majority interest. Through the Toucan Group, Powers and Hemphill also own and control a biological services company called Cognate BioServices, formerly known as Cognate Therapeutics ("Cognate").

5.      Concurrent with the 2004 investment, as a means of further compensating Powers and Toucan, NW Bio named Cognate to be its manufacturer of the dendritic cell vaccines to be used in its clinical trials. As Powers tightened her grip over NW Bio with her appointment as Board Chair in 2007 and CEO and other executive titles in 2011, more and more cash and equity was transferred to Cognate and Toucan. In all, a report by independent stock research firm Phase V Research calculates that NW Bio recorded an astonishing $308.7 million in costs related to its transactions with Toucan Group companies (especially Cognate) and Powers herself – accounting for more than 54% of the Company's entire accumulated deficit since 2004. *See* Phase V Research report at 14 (*available at* http://www.phasefiveresearch.com/wp-content/uploads/2015/10/NWBO- PhaseFive-Oct-2015.pdf).

6.      Misleading stock promotion played a central role in this scheme. Inflating investor expectations regarding NW Bio's drug candidates and clinical trials allowed Defendants to repeatedly tap capital markets to raise critical funding. Moreover, a lucrative conversion deal that NW Bio and Cognate entered into prior to the Class Period ensured Cognate (and therefore Powers and her Toucan Group of companies) huge windfalls if they could keep the stock above $4 (or, for a few conversions, $3.20). This was particularly important because Cognate was in economic distress at the time and was unable to meet its financial obligations.

7.      To inflate the price of NW Bio stock, Defendants made false and misleading statements to investors throughout the Class Period regarding DCVax-Direct, DCVax-L, and NW Bio's clinical

3

trials.  For example, in a January 13, 2014 presentation, the Company claimed that ">80% of patients respond" and that "Median PFS & OS extended by 1-1/2 years or more beyond results with SOC," when in fact no such efficacy had ever been established.  Similarly, in March 2014, Defendants cherry-picked preliminary information from the earliest stages of a DVax-Direct study to claim evidence of widespread "tumor cell death, tumor shrinkage, substantial immune cell accumulation in their tumors and/or stabilization." These statements were so misleading that on June 19, 2014, the Vice-President of Clinical Research at NW Bio's lead trial site, MD Anderson Cancer Center, conceded that Defendants' press release was "concerning," "hype," and "inappropriate."  On this partial disclosure, NW Bio shares dropped $1.79, or almost 20%, on heavy trading volume.  On July 7, 2014, after a report published on investor website *SeekingAlpha.com* further exposed Defendants' misleading promotional activity, shares declined another $.43, or more than 6%, to close at $6.71.

8.      Defendants were equally misleading in their decision to omit from investors material adverse information crucial to understanding NW Bio's clinical trials, especially its Phase III clinical trial of DCVax-L.  NW Bio repeatedly told the government that interim efficacy analysis was built into that trial, and in March 2013, told investors it "expects to reach its first interim analysis for efficacy by approximately Q3 of this year."  However, after results failed to meet expectations, Defendants came up with a series of excuses to hide the lack of efficacy from investors.  First, Defendants said that there was a delay in tabulation, which, as a leading expert explains at paragraph 47 below, is nonsensical because these interim analyses can be quickly completed.   Then, Defendants decided to alter the trial size in order to reduce the survival benefit necessary to claim success.  Finally, Defendants claimed that there were no interim efficacy analyses, even though NW Bio's trial registrations filed with the FDA and prior public statements said the exact opposite.

4

9.      Ultimately, investors learned of the trial's efficacy problems only when the FDA issued a clinical hold on August 21, 2015, halting further trial registration.  On that news, NW Bio stock fell $1.92, or more than 21%, to close at $6.96.  As is detailed herein, Plaintiffs and other Class members suffered significant losses as a result of Defendants' misrepresentations and omissions.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule l0b-5 promulgated thereunder by the SEC, 17 C.F.R § 240.10b-5.

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

12.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  NW Bio maintains its principal place of business in this District and many of the acts and practices complained of occurred in substantial part herein.

13.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

14.     Lead Plaintiff Neil Pastel, as set forth in his previously-filed Certification (Dkt. No. 7-5), purchased shares of NW Bio during the Class Period, and was damaged thereby.

15.     Lead Plaintiff Franklin Greer, as set forth in his previously-filed Certification (Dkt. No. 7-5), purchased shares of NW Bio during the Class Period, and was damaged thereby.

16.     Defendant NW Bio is a Delaware corporation with its principal executive offices located

at 4800 Montgomery Lane, Suite 800, Bethesda, Maryland 20814.  NW Bio's common stock trades on

the NASDAQ stock exchange under the ticker symbol "NWBO."

17.     Defendant Powers served at all relevant times as NW Bio's Chairperson, President, CEO,

Principal Financial Officer and Principal Accounting Officer.  Powers was formerly a senior global

finance executive at mega-fraud Enron Corporation.  Powers has also been a healthcare financier since

at least 2000.  Through the Toucan Group of companies, which she owns and controls with Hemphill,

Powers has been the largest shareholder of NW Bio at all relevant times.

18.     Powers also owns (through the Toucan Group) and controls Cognate, the contract

manufacturer through which NW Bio has funneled tens of millions of dollars of related party

transactions.  Cognate's former CEO, Alan Smith, has conceded in legal pleadings in a lawsuit between

himself and Cognate, Powers, Toucan and Hemphill, that Cognate's operations "were controlled largely,

if not exclusively, by Powers and Hemphill" and that Powers and Hemphill "often exercised that power

for the benefit of themselves, Toucan, and other of Toucan's holdings."

19.     NW Bio and Powers are collectively referenced herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

## BACKGROUND

**The FDA New Drug Approval Process**

20.     In the United States, pharmaceutical development and marketing is regulated by the

FDA, an agency of the U.S. Department of Health and Human Services.  The modern regulatory regime

was enacted in 1962, after Thalidomide, a sleeping pill, caused birth defects in thousands of babies.  In

reaction to this tragedy, Congress passed the Kefauver-Harris Amendments to the Food, Drug and

Cosmetic Act (the "FDCA") requiring that any company that wanted to market a pharmaceutical product

in the United States (in industry parlance, a "sponsor") had to obtain prior approval from the FDA, and

that the approval had to be based upon substantial scientific evidence demonstrating that the product was

safe and effective for its intended use in humans.

21.     The FDCA, as amended, requires the Commissioner of the FDA to refuse any drug

application if:

> (a)     "he has insufficient information to determine whether such drug is safe for use under such conditions;" or

> (b)     "there is a lack of substantial evidence that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the proposed labeling thereof."

21 U.S.C. § 355(d)(4)-(5).

22.     The FDA is only permitted to consider clinical evidence to be "substantial," and thus

satisfy the FDCA, if it:

> consist[s] of adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved, on the basis of which it could fairly and responsibly be concluded by such experts that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling or proposed labeling thereof.

21 U.S.C. § 355(d).  Well-controlled clinical investigations measure the subject drug against a control

group, which is provided either a placebo or another recognized drug for comparison.  Moreover, well-

controlled clinical investigations are almost always conducted in a "double-blinded" manner, meaning

that the tests are designed so that the study participants and the investigators (as well as the sponsor and

associated research organizations) do not know whether each participant has been provided the

candidate drug or is a member of the control group.  Double-blinding is intended to minimize test bias

and error that can arise when the participant and/or investigator have knowledge of the assigned treatment.

23.     Prior to conducting any clinical research in humans, a sponsor must screen the proposed drug (or biologic) for toxicity with animal studies, and file an Investigational New Drug ("IND") application with the FDA.  Although there are technically three types of INDs, virtually all drugs are developed under the standard development IND (also known as an investigator IND).[1]   An IND application includes the following information:

> (c)     animal pharmacology and toxicology studies sufficient to permit an assessment as to whether the product is reasonably safe for initial testing in humans.  Any previous experience with the drug in humans (such as use in foreign countries) also must be included.

> (d)     manufacturing information describing the composition, manufacturer, stability, and controls used for manufacturing the drug substance and the drug product.  This information is assessed to ensure that the company can adequately produce and supply consistent batches of the drug.

> (e)     clinical protocols and investigator information including sufficient detail regarding the proposed protocols for clinical studies to assess whether the initial-phase trials will expose human subjects to unnecessary risks.

The sponsor must also commit to obtain informed consent from the research subjects, to obtain review of the study by a local institutional review board ("IRB"), and to adhere to the investigational new drug regulations.   21 C.F.R. § 312.23.   After filing an IND, the sponsor must wait 30 days before commencing human clinical trials.

24.     The sponsor, not the FDA, is responsible for determining the design of clinical trials and the protocols for each trial.  If a sponsor wants the FDA to agree to the sufficiency of a particular

---

[1] The other two types of INDs are *treatment INDs*, for experimental drugs showing promise in clinical testing for serious or immediately life-threatening conditions while the final clinical work is conducted and the FDA review takes place, and *emergency use INDs*, for experimental drugs in emergency situations that do not allow time for submission of an IND under standard procedures.

protocol, the sponsor may request a Special Protocol Assessment pursuant to 21 U.S.C. § 355(b)(5)(C). Under this provision, the FDA and sponsor meet to discuss the sponsor's proposed protocols, and reduce any agreements to writings that become part of the administrative record and, as such, may not be changed except by agreement or under exceptional medical or scientific circumstances. *Id.* NW Bio did not apply for, and did not receive, any Special Protocol Assessments in connection with its clinical testing of DCVax-L or DCVax-Direct.

25.     The success or failure of a clinical trial is measured by whether the trial meets pre-specified endpoints (target outcomes), and by the statistical significance of its results.   Statistical significance is generally measured on a scale from zero to one, with a zero indicating that it is virtually impossible that the results of the test were derived by chance (as opposed to the mechanism of the drug candidate, an artifact of test design, or another non-random causal mechanism) and a one indicating a virtual certainty that the results of the test were derived by chance.  The FDA traditionally considers a clinical trial to be statistically significant if this measure, called a "p-value," is lower than 0.05 in each of two or more corroborating well-controlled clinical trials.   Where only one well-controlled clinical trial is provided, the FDA generally requires significantly lower p-values to establish statistical significance.[2]  NW Bio intended to seek approval for DCVax-L with only one pivotal trial, the Phase III study referenced herein.  The FDA's publication *Guidance for Industry: Providing Clinical Evidence of Effectiveness for Human Drug and Biological Products* (1998), states that the FDA relies on a single study "generally only in cases in which a single multicenter study of excellent design provided highly

---

[2]  *See, e.g.*, *In re Nuvelo, Inc. Sec. Litig.*, 668 F. Supp. 2d 1217, 1230 (N.D. Cal. 2009) (acknowledging that in that case the FDA required a p-value of 0.00125 for a new drug approval application supported by only a single clinical trial).

reliable and statistically strong evidence of an important clinical benefit, such as an effect on survival, and a confirmatory study would have been difficult to conduct on ethical grounds." *Id*. at 7.

26.     A sponsor generally conducts clinical trials in three phases.  These phases, which are codified in FDA regulations, are as follows:

> (f)     Phase I.  Phase I studies "are designed to determine the metabolism and pharmacologic actions of the drug in humans, the side effects associated with increasing doses, and, if possible, to gain early evidence on effectiveness."

> (g)     Phase II.  Phase II studies are "typically well controlled" studies "conducted to evaluate the effectiveness of the drug for a particular indication or indications in patients with the disease or condition under study and to determine the common short-term side effects and risks associated with the drug."

> (h)     Phase III.  Phase III studies are expanded studies "performed after preliminary evidence suggesting effectiveness of the drug has been obtained, and are intended to gather the additional information about effectiveness and safety that is needed to evaluate the overall benefit-risk relationship of the drug and to provide an adequate basis for physician labeling. Phase 3 studies usually include from several hundred to several thousand subjects."

21 C.F.R. § 312.21.  Sometimes, sponsors combine two of these stages into a single trial.

27.     Although the FDA does not design the trials the sponsor conducts, FDA staff is willing to meet with sponsors to discuss trial designs and endpoints, and encourages sponsors to do so.  The questions that a sponsor asks and any guidance provided are reflected in meeting minutes, which serve as an official record of the meeting.  Except after drug approval, abandonment, or in connection with a public advisory committee meeting (which did not occur here), the FDA will not disclose its communications with sponsors.  Accordingly, sponsors exercise complete control over what the public will learn about their communications with the FDA.

28.     Trial protocols must be submitted to the FDA.  Except in cases involving a special protocol assessment, the FDA does not "approve" or give "clearance" to those protocols.  However, if

10

the FDA determines that a trial protocol submitted either exposes subjects to unreasonable and significant risk or, in the case of a Phase II or Phase III study, the "plan or protocol for the investigation is clearly deficient in design to meet its stated objectives," the FDA can halt or limit the trial by placing it on a total or partial "clinical hold." 21 C.F.R. § 312.42(b). FDA regulations require the agency to inform the sponsor of a deficiency and attempt to resolve the matter before issuing a clinical hold, unless patients are exposed to a serious and immediate risk. 21 C.F.R. § 312.42(c).

29.     Under Section 801 of the Food and Drug Administration Amendments Act ("FDAAA"), sponsors and other responsible trials must register trials conducted even in part within the United States with ClinicalTrials.gov, except for certain Phase I and other small trials. Section 402(j) of the FDAAA requires sponsors to include in an application for marketing approval of any new drug, biologic, or medical device a certification that they have complied with FDAAA § 801.

**Dendritic Cell Immunotherapy**

30.     Cancer immunotherapies are treatments designed to treat or prevent cancers using the body's own immune system. The most successful immunotherapies to date have been monoclonal antibodies, or proteins that attach to specific antigens. Once attached, they can recruit other parts of the immune system to destroy the cells containing the antigen. Herceptin, Avastin, and Erbitux are examples of successful approved monoclonal antibody immunotherapies.

31.     Dendritic cells are a type of cells found in mammalian immune system. They are found in the skin, the lining of the nose, lungs, stomach, and intestines, and in an immature state, within blood. Dendritic cells are not themselves antibodies or antigens, but they perform an important role by presenting antigens to the other immune system cells.

32.     In autologous dendritic cell immunotherapy, dendritic cells are harvested from a patient's body, processed in a laboratory setting to make them more concentrated and active, then transferred back into the human body.  Dendreon's Provenge, a prostate cancer immunotherapy, is an example of this approach.

**Powers Misuses NW Bio to Confer Windfalls Upon Her Private Companies**

33.     NW Bio is a development stage biotechnology company engaged in developing immunotherapy products to treat cancers in the United States and internationally.  The Company was founded in 1996 and reincorporated in Delaware in July 1998.

34.     Powers exercises complete control over NW Bio.  She is NW Bio's CEO, Chairperson of the Board, President, Principal Financial Officer, Principal Accounting Officer, and largest shareholder (including stakes held indirectly through her Toucan Group of companies).

35.     As a result of the 2004 investment in NW Bio by Powers and her Toucan Group companies, NW Bio named another Toucan Group company, Cognate, to be its outsourced manufacturer of immunotherapies.  In 2007, the same day that Powers was named Chairperson of NW Bio, an expanded manufacturing agreement was signed between NW Bio and Cognate.  Again in 2011, when Powers was appointed CEO/President of NW Bio, the Company signed a new and more lucrative agreement with Cognate.  Since then, Cognate's billings to NW Bio have skyrocketed:



Source: Phase V Research report dated October 28, 2015, "Northwest Biotherapeutics House of Cards is Ready to Collapse," at 12 (*available at* http://www.phasefiveresearch.com/wp-content/uploads/2015/10/NWBO-PhaseFive-Oct-2015.pdf). Cognate invoiced amounts far beyond what it could have charged in an arms' length, nonrelated-party arrangement. For comparison, NW Bio's contract manufacturing expenses dwarfed the estimated $6-10 million cost that a rival dendritic cell immunotherapy company, Immunocellular, incurred between 2011 and 2013 to complete a 278-patient glioblastoma trial. *See* "Northwest Bio and the Curious Relationship With Cognate BioServices" (*available at* http://seekingalpha.com/article/2321585-northwest-bio-and-the-curious-relationship-with-cognate-bioservices). Similarly, the Cognate payouts from NW Bio are higher than the total revenues of another contract immunotherapy manufacturer, Progenitor, over the same three-year period, even though Progenitor apparently has much larger operations – for example it has twice as many certified manufacturing facilities as Cognate and more clients. *Id.*

36.     Cognate reaped windfalls from NW Bio above and beyond its massively inflated manufacturing fees. Most significantly, under lucrative agreements that Powers caused NW Bio to enter into with Cognate, Cognate has been permitted to convert a substantial portion of outstanding invoices

into shares at below-market prices. These below-market conversions have diluted NW Bio's public shareholders and caused NW Bio to incur **$34,400,000** in losses that the Company labeled "inducement costs."

| Year | Cognate payables converted | Shares issued | Warrants issued | Excess "inducement" cost recorded |
|------|----------------------------|---------------|-----------------|-----------------------------------|
| 2011[3] | $9,200,000 | 46,000,000 | --- | $7,800,000 |
| 2012[4] | $7,500,000 | 2,800,000 | 1,400,000 | $3,100,000 |
| 2013[5] | $13,500,000 | 4,700,000 | 2,400,000 | $7,500,000 |
| 2014[2] | $16,800,000 | 4,200,000 | 2,200,000 | $16,000,000 |
| **Total**: | **$47,000,000** | **57,700,000** | **6,000,000** | **$34,400,000** |

Separately, NW Bio sold Cognate additional shares and warrants on June 30, 2014 at less than half of their fair market value, resulting in another $2.2 million inducement expense.

37.    Moreover, NW Bio has handed out largesse to Cognate in other ways. NW Bio gifted Cognate approximately $21.3 in excess "initiation" fees to enter into expanded 2014 contracts, even though Cognate already received generous remuneration under those contracts for the treatments it manufactured for NW Bio.[6] Further, in 2012, NW Bio issued $2.2 million worth of stock and warrants to settle a note that **Cognate** owed to an unrelated third party. Despite paying this debt on behalf of Cognate, NW Bio states that it "does not expect reimbursement from Cognate."[7] NW Bio has provided no justification for its decision to pay debts owed by Cognate.

38.    In addition to all of these windfalls, NW Bio has spent approximately $47.9 million to purchase facilities and 37 acres of land in England for Cognate's benefit and use. *See* Forms 8-K dated August 19, 2014 and December 15, 2014. NW Bio has also capitalized $6.2 million in environmental

---

[3] Source: 2011 Form 10-K filed on April 13, 2012.
[4] Source: 2012 Form 10-K filed on April 8, 2013.
[5] Source: 2014 Form 10-K filed on March 17, 2015.
[6] Source: 2014 Form 10-K filed on March 17, 2015.
[7] Source: 2012 Form 10-K filed on April 8, 2013.

liability in connection with this property.  *See* 2014 Form 10-K filed March 17, 2015.  Although NW Bio has not been entirely clear with investors regarding its intention to provide these facilities to Cognate, UK public records leave no doubt that is the purpose. When seeking to change the classification of the existing structures, NW Bio's subsidiary stated that "CBS [*i.e.*, Cognate BioServices] ultimately plans to build the largest Advanced Therapy Medicines (ATMP) manufacturing facility in Europe" and "[t]he site is proposed to be operated by a contract manufacturer of medicines."[8]

39.     NW Bio has not explained why it would purchase facilities for Cognate, especially because Cognate is supposed to be operated as a separate company and already charges NW Bio handsomely for each DCVax treatment it manufactures.  In any event, as NW Bio has conceded in its pre-Class Period filings, Cognate has overcapacity in existing facilities and does not need the UK facility to fulfill anticipated services for NW Bio, even if DCVax-L was approved:

> Cognate's manufacturing facility for clinical-grade cell products is located in Memphis, Tennessee, near the airport.  Memphis is a worldwide air shipping hub for both Federal Express and UPS.  Cognate's facility is quite large, and contains substantial expansion space in addition to the portions currently built out and in use.   The current manufacturing capacity is sufficient to produce DCVax for approximately 300 patients per year – an amount in excess of what is needed for the late stage clinical trial under way. ***There is a large amount of expansion space, which is already planned for build-out in stages to allow for scale-up of production capacity in a modular fashion as the need increases for commercialization.   This would allow Cognate's current facility to increase to a total capacity of some 5,000 patients per year.***   As a comparison, Dendreon, with a market capitalization in excess of $5 billion at the time, commercially launched their Provenge dendritic cell vaccine for prostate cancer with initial manufacturing capacity for only 2,000 patients per year.  [2011 Form 10-K filed on April 13, 2012 (emphasis added)].

40.     In total, Phase V Research has calculated that ***NW Bio has recorded $308.7 million in costs related to the lavish benefits it conferred upon Cognate, Toucan and Powers.***  This amounts to

---

[8] *See* U.K. filings *available at* http://plan.scambs.gov.uk/swiftlg/MediaTemp/1132583-499878.pdf and http://plan.scambs.gov.uk/swiftlg/MediaTemp/1132583-504307.pdf.

over 50% of the Company's entire accumulated deficit between 2004 and the first half of 2015.  *See* October 28, 2015 Phase V Research report, *supra*, at 14.

**NW Bio's Unproved DCVax-L and DCVax-Direct Products**

41.    NW Bio's lead product, DCVax-L, is an unapproved autologous dendritic cell immunotherapy for the treatment of operable glioblastoma brain tumors, and potentially other operable cancer tumors.    DCVax-L is comprised of differentiated, matured, activated dendritic cells, the precursors of which are derived from the patient's white blood cells, and tumor lysate material (which contains antigens and biomarkers).    DCVax-L is manufactured in batches for each patient of size sufficient to cover an entire course of ten treatments, which are applied via intradermal injections at days 0, 10, 20, and at weeks 8, 16, 32, 48, 72, 96 and 120.

42.    DCVax-L is currently in a Phase III clinical trial (the "DCVax-L Trial"), officially entitled "Study of a Drug [DCVax®-L] to Treat Newly Diagnosed GBM Brain Cancer (GBM)."   The study began in 2005 as an open label, non-randomized Phase II study without placebo controls.

43.    Since then, NW Bio has repeatedly made major changes to trial protocol, including as follows:

- In late 2006, NW Bio modified the protocol to switch the study, still designated as Phase II, to a randomized, open label design where all patients would receive standard of care radiation and chemotherapy, and 2/3 of patients would additionally receive DCVax-L.

- According to a May 6, 2008 clinical trial registration update that NW Bio caused to be filed on Clinicaltrials.gov, a placebo control was added to the trial.

- A later update reflected the addition of a one-way "crossover" to patients randomized to the placebo arm.

16

- A June 9, 2009 update indicated that NW Bio was "not recruiting" new patients into the trial.

- An update dated April 19, 2011 indicated that the trial was once again recruiting and had been increased to 240 patients.

- An update dated May 17, 2012 indicated that NW Bio had redesignated the DCVax-L trial as Phase III and expanded it to 300 patients. *See* May 17, 2012 clinical trial registration update, *available at* https://clinicaltrials.gov/archive/NCT00045968/ 2012_05_17.

NW Bio has further updated its DCVax-L trial registration more than fifty times since May 17, 2012. *See* https://clinicaltrials.gov/archive/NCT00045968.   Each time, NW Bio told the FDA that "[i]nterim analyses to assess efficacy are incorporated in the trial design."   In a March 7, 2013 press release, NW Bio further stated that the Company "expects to reach its first interim analysis for efficacy by approximately Q3 of this year."

44.   Although not specified in DCVax-L trial protocol, NW Bio placed patients who were initially screened for the DCVax-L trial but did not meet trial inclusion criteria after a second screening into what the Company called an "information arm."   The term "information arm" is not referenced on the DCVax-L trial protocol.   Instead, these patients were provided DCVax-L on an open-label basis under a separate protocol labeled "Expanded Access Protocol for GBM Patients With Already Manufactured DCVax®-L Who Have Screen-Failed Protocol 020221 (DCVax-L EAP)."

45.   According to Dr. Richard A. Guarino, a renowned expert on clinical trial design and the FDA drug approval process, and author of the leading guidebook on the topic, "New Drug Approval Process, Fifth Edition" (CRC Press 2009), "the term 'information arm' is another way of expressing an

open label, uncontrolled study."[9]  Such uncontrolled studies are not capable of providing the "substantial evidence" of efficacy required for approval.  As the FDA makes clear in 21 CFR § 314.126, "the purpose of conducting clinical investigations of a drug is to distinguish the effect of a drug from other influences, such as spontaneous change in the course of the disease, placebo effect, or biased observation."  For that reason, the "substantial evidence" of efficacy must come from "well-controlled" studies.  *Id.*

46.     On December 13, 2013, NW Bio issued a press release announcing that it had registered 66 events in the DCVax-L trial, triggering an interim safety and efficacy review.  The Company said that the interim review would be completed by a data monitoring committee in approximately six to eight weeks.  The press release also stated that a second review would take place after 88 events.

47.     According to Dr. Guarino, an interim analysis of 66 patients in a trial of this design could easily be accomplished in a few weeks and could certainly be completed within the six- to eight-week period referenced in NW Bio's press release.  Dr. Guarino explained: "there is absolutely no reason why an interim analysis could not be completed within a few weeks."

48.     Besides DCVax-L, NW Bio had only one other product in active clinical research during the Class Period, DCVax-Direct.    DCVax-Direct is an unapproved autologous dendritic cell

---

[9] Dr. Guarino was retained by Plaintiffs to provide background information on clinical trial design and the FDA regulatory process.  Dr. Guarino has over 40 years of industry experience.  Dr. Guarino has served as Director of Clinical Research at Sandoz Pharmaceuticals, Inc. (now Novartis) and Vice President and Medical Director at USV Pharmaceuticals (later called Revlon Healthcare) and Chief Medical and Regulatory Director of Validus Pharmaceutical LLC.  For more than thirty years, he has consulted with numerous pharmaceutical companies of all sizes regarding clinical research, the FDA regulatory process, and other related topics.  He has been an Associate Professor at Farleigh Dickinson University, served as Director of Medical Education and Director of IND/NDA courses for pharmaceutical industry continuing education firms, and guest lectured on topics regarding clinical research and regulatory compliance at institutions and universities around the world.

immunotherapy for the treatment of various inoperable cancerous tumors.  DCVax-Direct is comprised

of differentiated, partially-matured dendritic cells, which are derived from a patient's white blood cells,

and are subsequently injected into an inoperable solid tumor using ultrasound or other imaging for

guidance.  NW Bio asserts that DCVax-Direct can pick up the tumor biomarkers and activate dendritic

cells *in situ* in the tumor.

49.     In the second half of 2013, NW Bio began a 60-patient Phase I/II clinical trial with

DCVax-Direct for several types of inoperable solid tumor cancers.  The trial took place at two sites: MD

Anderson Cancer Center in Houston and Orland Health (formerly MD Anderson, Orlando).  Most

patients for this trial were not recruited until March-June 2014.  For each patient, the vaccine was

separately manufactured, a process that took several weeks.  Thereafter, the treatment regimen lasted up

to eight months.

## DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS

50.     The Class Period begins on January 13, 2014, when the Company presented a "Corporate

Overview" at the Biotech Showcase conference, and published the same on its website.  The Corporate

Overview falsely represented that DCVax had a ">80% response rate" and showed "Median PFS & OS

extended by 1-1/2 years or more beyond results with SOC."  These statements were materially false and

misleading when made because: (a) neither DCVax-L nor DCVax-Direct had demonstrated an 80+%

response rate in any well-designed clinical trial; (b) neither DCVax-L nor DCVax-Direct had

demonstrated a 1-1/2 year extension in median overall survival or progression free survival over

standard of care in any well-designed clinical trial; and (c) even the biased, open label DCVax-L study

that the Company called an "information arm" did not demonstrate the response rate or survival benefits

claimed in NW Bio's investor presentation.

51.     On March 7, 2014, NW Bio issued a press release titled, "NW Bio Receives Recommendation to Continue With Phase III GBM Brain Cancer Trial Based On Data Safety Monitoring Board's Safety Review," which stated that the Data Safety Monitoring Board had made an "unblinded review of the safety data … and recommended that the trial continue as planned.  The DSMB's review of the efficacy data is still pending."

52.     The statements identified in paragraph 51 above were materially false and misleading when made because the review of efficacy data by the DSMB was not pending and would easily have been completed (unless, of course, the DSMB was instructed not to complete it) long before March 7, 2014, which was four months after the event threshold was crossed.  These statements were also materially false and misleading when made because they omitted that the Company did not need a formal interim analysis from the Data Safety Monitoring Board to make a ballpark assessment of efficacy.  As Dr. Guarino explains, "Even if NW Bio remained blinded as to trial data it would still receive reports regarding trial enrollment and progress towards the event threshold.  From this information, and knowing from the protocol that 2/3 of patients were randomized to receive the experimental therapy, NW Bio could back into a ballpark assessment of whether or not the trial is giving positive results."

53.     At this time, and throughout the Class Period, Defendants ensured that false and misleading statements made in press releases received maximum exposure among investors by paying for its messages to be distributed on social media.  At NW Bio, this function was overseen by Defendant Powers at an executive level and on a day-to-day basis was handled by Les Goldman ("Goldman"), vice president of business development, and David Warren ("Warren"), vice president of strategic initiatives.  NW Bio hired MDM Worldwide Solutions, a social media agency, to assist in these efforts.  MDM

Worldwide Solutions served as NW Bio's social media agency from 2012 until April 2015, or most of the Class Period.  Steve Angel, CEO of MDM Worldwide Solutions, said that his company derived content from press releases provided to him after publication by Goldman and Warren, which were rewritten into draft social media entries and sent back to NW Bio for review before publication.  The published social media posts frequently did not disclose NW Bio's role in creating and editing the content.

54.     On March 28, 2014, NW Bio issued a press release addressing its Phase III trial for DCVax-L.  The press release stated, *inter alia*, that:

> The Company's Phase III trial, like all other trials, will be considered to reach statistical significance if it reaches a p value of 0.05. "P value" is a measure of the probability that trial results were due to chance, and not the result of the experimental treatment being tested. So, the lower the p value, the better it is. The p value generally required by regulators for statistical significance is 0.05.

> The Company has created a significant cushion or buffer for achieving this p value of 0.05 by designing its trial to a level of 0.02 rather than designing to the exact 0.05 level. Having this cushion makes the Company's trial design more likely for the trial to succeed….

> ***

> Feuerstein further tries to claim that the Company's trial could originally have been considered statistically significant with a p value of 0.05 but somehow must now meet a totally different standard and reach a p value of 0.02 in order to be considered statistically significant. Once again, Feuerstein's claim is baseless and wrong. There has been no such change: the Company's trial design and target p value are the same now as they have been throughout the trial. The Company has consistently reported throughout the trial that it is designed to the 0.02 level. That is a major strength and an intentional trial design, as already explained – not a weakness or the result of problems, as Feuerstein falsely asserts.

55.     The statements identified in paragraph 54 above were materially false and misleading when made because: (a) although a p-value of 0.05 in each of two trials is considered to be the standard measure of statistical significance when a sponsor substantiates efficacy with *two* well-controlled

clinical trials, as is the typical course, the FDA does not consider a p-value of 0.05 to be the *de facto*

measure of statistical significance where, as here, a sponsor intends to seek approval on the basis of only

a single Phase III clinical trial; (b) the Company did not choose a p-value of 0.02 as a "buffer" and

setting that p-value as an endpoint did not provide NW Bio with a "buffer"; instead, the lower p-value

was consistent with NW Bio's choice to attempt to proceed only on the basis of a single Phase III

clinical trial; and (c) NW Bio did not maintain a consistent trial design throughout the DCVax-L trial,

but instead made several significant changes to the trial during on again/off again conduct.

56.     On April 1, 2014, NW Bio filed its 2013 annual report on Form 10-K, which was signed

by Powers.  The 2013 Form 10-K stated:

> In December 2013, we announced that the number of events required to trigger the first
> interim analysis of the Phase III clinical trial had been reached. This milestone is
> measured by "events," which are defined as either a tumor recurrence or a death. With
> the current trial size, the pre-specified trigger number for the first interim analysis is 66
> such events, comprising 60% of the 110 events required to reach the primary endpoint of
> the Phase III trial. The interim analysis will be conducted by an independent Data
> Monitoring Committee, or DMC, with assistance from the independent clinical research
> organization, or CRO, managing the trial. In March 2014, we announced that the DMC
> has conducted a review of the safety data, and recommended that the trial continue as
> planned. As we also announced the DMC's interim analysis of efficacy data remains
> outstanding. With the current trial size, a second interim analysis will occur when 88
> events, comprising 80% of the total 110 events, have been reached.
>
> ***
>
> In clinical trials to date, our DCVax treatments have been achieving what we believe to
> be striking results. In patients with newly diagnosed GBM, the most aggressive and lethal
> form of brain cancer, patients treated with full standard of care treatment today (surgery,
> radiation and chemotherapy), typically have recurrence of their cancer within a median of
> 6.9 months, and typically die within a median of 14.6 months. In contrast, our early stage
> clinical trials showed that patients who received DCVax in addition to standard of care
> typically did not experience recurrence until approximately 2 years, rather than 6.9
> months, and typically lived for approximately 3 years, rather than just 14.6 months. This
> data, if reproducible in a larger study, such as our current Phase III trial, would
> demonstrate that patients with GBM can derive significant clinical benefit from DCVax
> treatment. Moreover, long-term follow-up data on the GBM patients treated with DCVax
> in prior clinical trials show that, as of the latest update, approximately 33% of the patients

have reached or exceeded 4 years' survival, and approximately 27% of the patients have reached or exceeded 6 years' survival (as compared with the median survival of 14.6 months with standard of care treatment today).

57.    The statements identified in paragraph 56 above regarding the Data Safety Monitoring Board's interim analysis of efficacy were materially false and misleading when made because the assertion that the analysis remained "outstanding" falsely implied that it was in the process of being completed, when in fact it was either completed and buried, or the DSMB had been directed not to complete it.  Moreover, the "striking results" touted by NW Bio were materially false and misleading when made because they seek to compare biased results supposedly reported by NW Bio in open label studies with standard of care data derived from well-designed, controlled studies.  This is comparing apples to oranges.  As Dr. Guarino explains, "It is well-known that open label, uncontrolled trials tend to significantly overstate the efficacy relative to what one would see in a well-controlled, double-blinded study."

58.    On April 9, 2014, NW Bio took advantage of its artificially-inflated stock price to sell 2,272,727 shares of common stock to an unidentified institutional investor at $6.60 per share, or $15 million, and granted the investor rights to purchase an additional tranche of 2,272,727 shares of common stock at $7.50 per share within one year, for a total additional subscription of $17.05 million.  These rights were subsequently exchanged for warrants to purchase the same amount of shares at a strike price of $5.15.  As the Company conceded in its quarterly report filed on Form 10-Q on May 15, 2014, this capital raise was important to NW Bio because "recurring operating losses, net operating cash flow deficits, and a deficit accumulated during the development stage" gave rise to a "substantial doubt about the Company's ability to continue as a going concern."

59.    On May 15, 2014, NW Bio issued a press release announcing cherry-picked anecdotal

data from a patient in the DCVax-Direct Trial.  The press release stated:

> Northwest Biotherapeutics … today provided an initial patient case study, showing signs
> of tumor necrosis (tumor death) and initial tumor regression, from the Company's
> ongoing DCVax-Direct trial for all types of inoperable solid tumors.  The Company plans
> to announce further case study information prior to the annual ASCO conference, while it
> continues collecting data from the trial.  Although the trial is still at an early stage, with
> many of the patients only part way through the treatment regimen, the Company also
> plans to provide overall information about the data to date by the time of the ASCO
> conference.
>
> The specific case study announced today involves a sarcoma patient with a large tumor
> mass and multiple inoperable metastatic tumors in the lung.  This patient received the
> first 3 DCVax-Direct injections through the course of a month, starting in February.  He
> received a fourth injection in early April and then was scanned for results in early May.
> At that time, this patient's MRI scan showed extensive necrosis and partial collapse of
> the injected large tumor mass, and a CT scan showed some early indication of shrinkage
> of one of the non-injected metastasized tumors.  These results suggest both local and
> systemic effects of the DCVax-Direct treatment, as were seen in the pre-clinical studies.
>
> These encouraging results were further supported by tumor biopsies taken at the time of
> the most recent injection, which showed a high rate of tumor necrosis and appearance of
> T cells (immune cells) infiltrating into the injected tumor.
>
> "We are excited to see signs of DCVax-Direct mobilizing the immune system to fight the
> tumors in these patients with advanced metastatic cancer, even while we are still so early
> in this ongoing trial and while patients are only part way through their treatments,"
> commented Linda F. Powers, CEO of NW Bio.  "Immune therapies generally work much
> more slowly than chemotherapy or targeted drugs, so it is especially encouraging to see
> any such signs so soon."

60.    The statements identified in paragraph 59 above were materially false and misleading when made because: (a) the results touted by Defendants had not been substantiated by trial investigators, and the statements do not identify themselves as Company hypotheses made without consulting trial investigators; (b) cherry-picked anecdotal results from a single patient were inappropriately promotional and could not possibly provide meaningful insight into the trial of 60 patients, most of whom had not even been recruited; (c) the statements omitted that even the cherry-picked anecdotal patient had not received the full course of treatment, and the Company had no idea

whether he would even survive that course of treatment; (d) the release omitted that signs of tumor necrosis were just as likely indicative of needle trauma as a response to the vaccine; (e) the results were too preliminary and too anecdotal to "suggest … both local and systemic effects of the DCVax-Direct treatment"; and (f) the preliminary results of this single, cherry-picked patient did not evidence "signs of DCVax-Direct mobilizing the immune system."

61.     On May 27, 2014, NW Bio issued a press release claiming a positive initial response in the DCVax-Direct trial.  The press release stated:

> Northwest Biotherapeutics … today provided a summary of initial data to date in its ongoing Phase I/II clinical trial of DCVax-Direct for all types of inoperable solid tumors.  The Company reported that over 50% of the patients who have completed at least half of the 6 treatments in the trial are already showing preliminary signs of cancer cell death, tumor shrinkage and/or stabilization (i.e., stopping the progression) of their advanced cancer.
>
> ***
>
> Among the 19 patients who have received at least half of the 6 treatments, 11 patients have already shown some preliminary positive responses to the treatments, including the following:
> - 8 of the 11 patients have shown signs of tumor necrosis (cell death) and immune cell infiltration, as well as stabilized disease that has stopped progressing, following the injections of DCVax-Direct.
> - For all of these 8 patients, biopsies indicated substantial to extensive tumor necrosis, as well as substantial accumulations of immune cells infiltrating into and around the patients' tumors, following the DCVax-Direct injections.
> - For 6 of these 8 patients, imaging scans also indicated either tumor shrinkage or no disease progression following the DCVax-Direct injections.
> - For the other 2 of these 8 patients, imaging scans seemed to indicate some enlargement of their tumors.  However, the needle biopsies revealed that the tumor was filled with necrosis (dead tumor cells) and infiltrating immune cells, as noted above.  In addition, these patients have reported significant improvement in their physical condition and clinical symptoms.
> - The other 3 of the 11 patients have shown stabilized disease, with no growth in their advanced and aggressive tumors following the DCVax-Direct injections, but have not yet shown definitive necrosis or infiltration of immune cells into their tumors.

62.     The statements identified in paragraph 61 above were materially false and misleading

when made because: (a) the results touted by Defendants had not been substantiated by trial investigators, and the statements do not identify themselves as Company hypotheses made without consulting trial investigators; (b) the statements omitted that the preliminary results actually failed to establish a response as defined by industry-standard RECIST criteria;[10] (c) the statements omitted that signs of necrosis or tumor death were just as likely caused by needle trauma as a response to the vaccine; and (d) the results were too preliminary and too anecdotal to suggest anything about the actual effects of DCVax-Direct.

63.     On June 11, 2014, NW Bio issued another press release touting partial, preliminary responses to the DCVax-Direct trial.  The press release stated:

… in the ongoing Phase I/II clinical trial of DCVax-Direct for all types of inoperable solid tumors, all 9 out of 9 patients who have received 4 of the 6 planned injections are showing tumor cell death, tumor shrinkage, substantial immune cell accumulation in their tumors and/or stabilization (i.e., stopping the progression) of their advanced cancer.  In addition, in 3 of these 9 patients, biopsies now show no live tumor cells in the injected tumor.

To date, 20 patients (including the 9 referenced above) have received at least 3 of the 6 total injections, and 13 of these 20 patients are showing tumor cell death, tumor shrinkage, substantial accumulation of immune cells in the tumors, and/or stabilization of their disease.  The Company plans to report more details when the patients are further along in the treatment regimen.  The first 3 injections are given in the first 2 weeks of the 32-week treatment regimen (at Day 0, Day 7 and Day 14).

So far, 9 of the patients have received 4 of the 6 planned injections, and all 9 of these 9 patients are showing tumor cell death, tumor shrinkage, substantial accumulation of immune cells in the tumors, and/or stabilization of the patients' disease.  The 4th injection is administered in week 8 of the 32-week treatment regimen.  (The overall treatment regimen includes 6 injections at Days 0, 7 and 14, and Weeks 8, 16 and 32.)

Also, in a new finding, biopsies taken in 3 of these 9 patients now show no live tumor cells in the tumor that was injected.  These 3 cases include diverse, advanced and particularly aggressive cancers:  1 metastatic pancreatic cancer case, 1 metastatic colon

---

[10] "RECIST" is an acronym for **R**esponse **E**valuation **C**riteria **i**n **S**olid **T**umors.  Under RECIST criteria, a partial response requires a 30% reduction in the size of the target lesion.

cancer case and 1 metastatic sarcoma case.  These patients' tumors show some enlargement on imaging scans, but the biopsies show that live tumor cells are no longer detectable and immune cells are now found there.  Each of these 3 patients was treated with the lowest dose level (2 million cells per treatment).

In these 3 patients, as well as the other patients in the trial, only one of their tumors has been injected with DCVax-Direct.  The Company plans to inject multiple tumors in its further studies of DCVax-Direct.

"These early glimpses are indicating an increasingly encouraging picture – especially the absence of any live tumor cells in 3 of the patients who have received 4 of the 6 planned injections of DCVax-Direct," commented Linda Powers, CEO of NW Bio.  "The 4th injection is still quite early, as it is just 8 weeks into the 32-week treatment regimen.  For patients with such advanced, metastatic, inoperable cancers, who have failed other existing treatments, these are exciting findings."

*** 

This growing body of initial early data is a result of both imaging scans and biopsies.  The 9 patients who have received 4 injections show a range of tumor reactions, from shrinkage to no growth to some enlargement.  However, in all of these patients, the biopsies show substantial tumor cell death, and in the cases of enlargement, the biopsies show major infiltration and accumulation of immune cells in and around the tumors – potential indications of an immune response to the cancer.

64.     The statements identified in paragraph 63 above were materially false and misleading when made because: (a) the results touted by Defendants had not been substantiated by trial investigators, and the statements do not identify themselves as Company hypotheses made without consulting trial investigators; (b) the statements omitted that the preliminary results actually failed to establish a response as defined by industry-standard RECIST criteria; (c) the statements omitted that signs of necrosis or tumor death were just as likely caused by needle trauma as a response to the vaccine; and (d) the results were too preliminary and too anecdotal to suggest anything about the actual effects of DCVax-Direct.

65.     On June 19, 2014, *The Street.com* reported that MD Anderson issued a stern rebuke to NW Bio for making promotional, unjustified claims about results from the ongoing clinical trial of

DCVax-Direct.   The article quotes Dr. Aman Buzdar, vice president of clinical research at MD

Anderson, the site that NW Bio hired to conduct the DCVax-Direct trial, as admonishing that NW Bio's

disclosure of partial, preliminary data from the early stage trial "***is extremely unusual and***

***inappropriate***" and that he'd "***never come across a company that has done something like this before***."

According to the article,

> … Buzdar said investigators at MD Anderson and the two other hospitals conducting the
> DCVAX-Direct study have not reviewed or analyzed data at all because patients are still
> being enrolled and treated. The statements being made by Northwest Biotherapeutics
> about DCVax-Direct are derived from patient case report forms, which the hospitals are
> obliged to send to the company because it sponsored the study.

> If you flip the coin and the trial results were negative, do you think the company would
> be disclosing this type of information? No, the company is trying to create tremendous
> hype about its product, which is very concerning to me as an academic oncologist," said
> Buzdar.

> "A patient or an investor may read these press releases and see a rosy picture, which may
> not be so rosy when the entire dataset is analyzed," he added.

Dr. Buzdar also explained that the Company's statements about tumor necrosis were potentially

misleading:

> "The weakness of this approach is that there have been many studies in which tumors are
> injected locally -- the injections could consist of anything -- and you see tumor regression
> because of necrosis caused by inflammation," said Buzdar. "But it is a tremendous leap to
> say that this is a real response, which is why what the company is saying is so
> inappropriate."

66.     As a result of this article, which partially disclosed to investors Defendants' false and

misleading promotion of clinical study data, shares of NW Bio common stock dropped to $7.18 on June

29, 2014, a decline of $1.79 from the prior day close of $8.97, on very heavy volume.

67.     On July 7, 2014, Richard Pearson, an independent stock analyst and journalist, published

on *SeekingAlpha.com* a widely-disseminated article entitled "Behind the Promotion of Northwest Bio."

*See* http://seekingalpha.com/article/2301825-behind-the-promotion-of-northwest-bio.   The article concluded:

- Northwest Bio has been the subject of a massive promotional campaign which has seen the stock price soar.
- Many of the authors involved have close hidden ties to promotional firm MDM Worldwide and / or Redfish Creative.
- In some cases, authors have used fictitious identities and fake credentials within healthcare or finance. In fact they are simply paid writers.
- Redfish Creative reveals its use of bulk pricing for writing undisclosed promo articles and mass message board postings on Yahoo.
- Much of the promotional information written on Northwest has been either misleading or downright wrong.

                                   ***

… many of the authors who have written on Northwest are using fake identities and fake credentials. They pretend to be biologists, other scientists or fund managers. In fact, they are just paid writers.

Since mid 2012, Northwest has made use of an IR and "social media" stock promotion firm called MDM Worldwide. Shortly after Northwest began paying MDM, the bullish articles began to appear from these fake authors. At the exact same point in time, MDM built a website for Smith on Stocks and Larry Smith quickly initiated coverage on all of MDM's small cap biotech clients (including Northwest) with bullish / buy views. Smith has since written heavily on Northwest and has been the most ardent and outspoken bull on the stock.

Consistent with Mr. Pearson's assertions, certain versions of Larry Smith's website "Smith on Stocks,"

stated in small print inadvertently left at the bottom of the page that the website was "Powered by MDM

Solutions," -- *i.e.*, the social media agency paid by NW Bio and supervised by NW Bio executives.

68.     As a result of the additional partial disclosure of improper promotional activity, NW Bio

shares fell on heavy volume an additional $.43, or over 6%, to close at $6.71 per share on July 7, 2014.

69.     On August 11, 2014, NW Bio issued a press release entitled "NW Bio Obtains Approvals

for Enhancements of Phase III Trial of DCVax®-L for GBM Brain Cancer" indicating that it was going

to add 36 patients to the Phase III DCVax-L trial for a total of 348, and would more than double the

events (disease progression or death) that the trial would measure from 110 to 248.  The press release

stated:

> [Northwest Biotherapeutics] announced today that, following a 9-month process of regulatory submissions and reviews by regulators in the US, UK and Germany, it has obtained regulatory approvals to make certain enhancements to its ongoing Phase III clinical trial of DCVax-L Glioblastoma multiforme (GBM) brain cancer.  The enhancements will allow the statistical analysis of trial results to take account of a major new variable which has been identified in GBM research since the Company's Phase III trial began, and will lower the threshold for satisfying the primary endpoint of the trial.
>
> The Company has been blinded at all times, with no access to any data in the Phase III trial, and will remain fully blinded until the trial is completed.
>
> ***
>
> The new variable involves the level of certain white blood cells in GBM patients when they finish the 6 weeks of daily radiation to the brain which is part of the current standard of care treatment.  Important recent research has found that as many as 40% of GBM patients have such severely depressed white blood cell counts following radiation that their level is comparable to the level at which AIDs patients are put on continuous antibiotic treatments, prophylactically.  Further, this research has found that these GBM patients' white blood cell counts do not recover with the passage of time.  See, for example:  Grossman et al., 2011: Clin Cancer Res 17(16):5473-80; Ellsworth et al. 2014: Oncoimmunology 3(1):e27357. Epub 2014 Jan 3.
>
> ***
>
> Also under the enhancements, the threshold for satisfying the primary endpoint of the Phase III trial (which is Progression Free Survival, or PFS) will be lowered from requiring a 6-month difference to requiring only a 4-month difference between the PFS of the patients treated with DCVax-L and the PFS of patients in the control arm of the trial.
>
> The bases for reducing the threshold from 6 months to 4 months difference in PFS include increasing the total number of patients in the trial from 312 to 348, and increasing the number of "events" that will be counted in the statistical analyses at the end of the trial.  An "event" is a tumor recurrence or a patient death.
>
> The current trial plan involves counting 110 "events" from among the 312 total patients in the trial to evaluate whether the primary endpoint is met.  Under the enhancements of the trial, 248 "events" will be counted from the 348 total patients in the trial to evaluate whether the PFS primary endpoint is met.
>
> By increasing the number of "events" counted, the statistical basis of the trial, which is already quite strong, will be further strengthened.  As a result, it is anticipated that a 4-

month difference in PFS will be sufficient to reach the strong "p value" planned in the trial (0.02), and it will not be necessary to show a 6-month difference in PFS. ("p value" is a measure of statistical significance – the probability that trial results are due to chance, rather than the effects of the treatment. So, the smaller p value, the stronger the significance. Regulatory authorities generally require that the p value of trial results be 0.05 or lower for product approvals.)

70. The statements identified in paragraph 69 above were materially false and misleading when made because: (a) the change in trial size was not an "enhancement," but rather an attempt to move the goalposts in light of a lack of promising evidence from the trial as specified. As Dr. Guarino explained after reviewing this press release, "it is my opinion that this substantial increase in trial size was a result of not having specified a sufficient number of patients and events to prove efficacy of DCVax-L in GBM. There would be no plausible reason other than stated for a sponsor to incur the expense and delay of extending this clinical trial." This is especially true in light of the size of NW Bio's 125% increase in event threshold. Biotech analyst Adam Feuerstein stated, "In my 13 years covering biotech, I have never seen a company make such a large change to the statistical analysis of a phase III study"[11]; (b) the "new variable" referenced in this press release was not new, but was known since at least 2011 – before this trial entered Phase III; (c) it omitted that although the Company may not have had access to unblinded data, it had enough information about events and enrollment to gain a ballpark assessment of how the trial was progressing, especially in light of the 2:1 randomization; (d) the FDA had not "approved" the protocol change; and (e) while a p-value of 0.05 in each of two trials is considered to be the standard measure of statistical significance when a sponsor substantiates efficacy with two well-controlled clinical trials, as is the typical course, the FDA does not consider a p-value of 0.05 to be the *de facto* measure of statistical significance where, as here, a sponsor intends to seek

---

[11] A. Feuerstein, "Northwest Bio DC-Vax Study Changes Hint at Failure," *TheStreet.com*, August 12, 2014.

approval on the basis of only a single Phase III clinical trial.

71.     Also on August 11, 2014, NW Bio issued a press release announcing an update on the so-

called DCVax-L "information arm."  The press release stated:

> During 2011 and 2012, in addition to conducting the trial, the Company also treated 55
> GBM patients with DCVax-L on a compassionate basis in an "Information Arm" outside
> of the Phase III trial.  These 55 patients received the same DCVax-L treatment regimen
> used in the trial, at medical centers participating in the trial.  The 55 patients were not
> eligible for the Phase III trial because they were either definitely or potentially "rapid
> progressors": patients with such an aggressive form of GBM that their tumor was already
> re-growing during the 6 weeks of daily radiation to the brain and daily chemotherapy
> which followed the surgical removal of their original tumor as part of the current standard
> of care.
>
> "Rapid progressors" are usually excluded or segregated in studies and analyses because
> their disease is so accelerated that it is not comparable to regular GBM patients.  Regular
> GBM patients survive for a median of about 14.6 months with current standard of care.
> "Rapid progressors" have a much shorter life expectancy, in the range of 7 to 10 months,
> and generally are not expected to respond much to any treatments.
>
> ***
>
> The data received by the Company include the survival to date for all 55 patients in the
> "Information Arm" and data relating to the progression of their cancer for 43 of the 55
> patients.  According to initial analyses, the median Overall Survival for all 55 patients is
> 18 months; the median Overall Survival for the 43 patients is a little over 19 months.  The
> Company is in the process of further analyses of the data on these patients.

72.     The statements identified in paragraph 71 above were materially false and misleading

when made because: (a) they omitted mention that the results were significantly biased by the

uncontrolled nature of the "information arm" trial design; (b) the reported results were further inflated

by improper classifications that excluded certain "rapid progressors."  If appropriate classifications were

used, even with the benefit of open label biases, the "information arm" rapid progressors showed a

survival benefit in line with standard of care, signifying no meaningful benefit from the addition of

DCVax-L to the treatment regimen.  As Dr. Guarino explained,

> The data from the "information arm" does not suggest that the drug would prove effective

in a well-controlled trial. The "information arm" supposedly consists of patients whose radiologic images showed disease progression between surgical rescission and the initiation of DCVax-L injections. The term "information arm" is another way of expressing open label studies or uncontrolled studies. The results concluded from these studies are not acceptable as the sole basis for the approval of effectiveness as stated in the CFR 314.126. If these types of studies are used, carefully conducted and documented they may provide corroborative support for safety in addition to safety evaluations of well controlled studies. The Company isolates for its analysis a subset of only 41% of these patients, that the Company labels the patient's as "rapid progressors." However, NW Bio excluded from that tabulation five patients who died within ten weeks of surgery and they should have been considered also as rapid progressors, including two patients NW Bio called "indeterminate" and three others that NW Bio called "unclassified." Had these five patients been properly included in the statistical analysis as numbers in the "rapid progressors" tabulation, the median overall survival for rapid progressors on DCVax-L would have only been 9-10 months, not the 15.3 months claimed by NW Bio. In reviewing publications of studies of patients with GBM rapid progressors who have had the traditional therapy of surgery and chemotherapy, the overall survival rate on these patients ranged from 8.3 months to 10.8 months demonstrating no difference in benefit by adding the DCVax-L therapy to the GBM patients analyzed in the "information arm" analysis.

73. On August 13, 2014, NW Bio took advantage of the artificial inflation of its prospects arising from the material misrepresentations set forth herein, and the resulting artificial inflation in stock price, to sell $17.5 million in 5% convertible senior notes.

74. On November 13, 2014, the SEC Corporate Finance Division issued a letter to NW Bio regarding the failure to properly disclose Cognate stock transactions to investors. The letter said:

We note that Cognate BioServices, Inc. owns more than ten percent of your common stock, yet it does not appear to have filed any Section 16 ownership reports. Please advise. We urge all persons who are responsible for the accuracy and adequacy of the disclosure in the filing to be certain that the filing includes the information the Securities Exchange Act of 1934 and all applicable Exchange Act rules require. Since the company and its management are in possession of all facts relating to a company's disclosure, they are responsible for the accuracy and adequacy of the disclosure they have made.

75. On December 19, 2014, Cognate, Toucan, Powers and Hemphill filed delinquent Section 16 ownership reports, including some that were nearly four years overdue.

76. On December 10, 2014, Defendant Powers spoke at the Oppenheimer 25th Annual

33

Health Conference.  At the conference Defendant Powers stated:

> So our DCVax Phase III trial for brain cancer is our lead program.  It underwent a major expansion across the U.S. and in Europe.  We had a safety-only evaluation, of the, by the Data Safety Monitoring Committee.  Very importantly, in the latter part of the year we had some regulatory enhancements to the trial, which allow us to add some factors to the statistical analysis at the end of this trial.  Nothing changed about the eligibility for the trial.  Nothing changed about the treatment in the trial.  But by adding these factors at the end of the trial, counting more events, and adding factors, we were able to significantly de-risk the trial.  For example, in order for it to be a successful trial, we need only to show, instead of showing a six-month difference in the time to tumor recurrence, in patients who receive DCVax and those who don't, we only have to show four-month difference.  That's a big lowering of the threshold for success.
>
> ***
>
> Also very exciting in September we released information about 55 patients who had not been enrolled in the Phase III trial because they were too sick to meet the eligibility criteria.  After they had surgery to remove the tumor tissue and six weeks of daily radiation and chemotherapy, already by then the tumor was re-growing or appearing to.  That kind of a patient is, has such an aggressive form of cancer that normally they don't respond anything.  But we had already made the product for those patients because we make it while they're going through the six weeks of radiation. So as a compassionate use, we allowed those patients to be treated with the same DCVax product as in the clinical trial, on the same treatment schedule, at the same clinical trial sites, in the same time period, with the data collected by the same CRO, as the trial and maintained. And that data when we released it, showed that these patients who normally wouldn't be expected to only have survival in the 7 to 10 month range had survival in the 18 -19 months range.  So the patients who are even too sick to be in the trial really were getting a major benefit from the treatment.  That was a very encouraging set of additional data this year.

77.     These statements identified in paragraph 76 above were materially false and misleading when made because: (a) the interim analysis, as the Company conceded in 2013 and in dozens of regulatory registrations on Clinicaltrials.gov, was not "safety-only."   Rather, it reviewed safety and efficacy but the Company either buried the results or declined to have the DSMB complete the efficacy analysis, a sure sign that the DCVax-L trial was not showing promising efficacy results; (b) the substantial increase in trial size did not "de-risk" the trial, but rather reflected an increase risk in the DCVax-L trial in that it would not be needed if the trial as specified was adequate or its results

34

promising; (c) the reported "information arm" results were artificially inflated by the biased, open-label noncontrolled design of the study, and were further inflated by manipulating the definitions of "rapid progressors."  If appropriate classifications were used, even with the benefit of open-label biases, the "information arm" rapid progressors showed survival in line with standard of care, signifying no meaningful benefit from the addition of DCVax-L to the treatment regimen.

78.     On January 12, 2015, Defendant Powers made a verbal investor presentation at the BioTech Showcase 2015 conference.  She stated:

> In terms of efficacy, again, we are still in clinical trials, we have to see how the further trials read out, there's no guarantees, but we've seen up 'til now has been quite encouraging. These are extensions of the time to disease progression, progression free survival, and extensions of overall survival in the realm of years…
>
> ***
>
> We will be sometime this year conducting the first interim analysis for efficacy. That will be conducted by the Data Monitoring Committee. Up to now, the assessments have only been safety, so this will be the first assessment for efficacy. We do expect to complete patient recruitment, as I said. We will have ongoing follow-up of the 55 patient (Info Arm). Last September, we released information on 55 patients who were too sick to meet the eligibility criteria to enroll in the Phase three trial. But we had already manufactured product for them so on a compassionate use basis so we allowed them to be treated with the same DCVax product at the same medical centers as the clinical trials using the same treatment regimen as the clinical trials with the data collected by the same CRO that is conducting the clinical trial. The data was not collected by us.
>
> The results were quite striking. We published those in September. Patients who have such rapid progression that their tumor is already regrowing by the time they finish their six weeks of radiation and chemo after removing the tumor in the first place — which is a really aggressive version of the cancer — those patients typically live seven to ten months. And in our group there, they were at the time, in the 18 month range.

79.     The statements identified in paragraph 78 above were false and misleading when made because: (a) NW Bio had no evidence from well-controlled trials showing any "extensions of the time to disease progression, progression free survival, and extensions of overall survival in the realm of years"; (b) the interim review was not scheduled to commence in 2015 but in fact had commenced in 2013 and

required only a few weeks to complete.  That the Company has not disclosed results indicates that it either buried the results or declined to have the DSMB complete the efficacy analysis, a sure sign that the DCVax-L trial was not showing promising efficacy results; and (c) the reported "information arm" results were not "striking" but were artificially inflated by the biased, open-label noncontrolled design of the study, and were further inflated by manipulating the definitions of "rapid progressors." If appropriate classifications were used, even with the benefit of open-label biases, the "information arm" rapid progressors showed survival in line with standard of care, signifying no meaningful benefit from the addition of DCVax-L to the treatment regimen.

80. On March 17, 2015, NW Bio filed its annual report with the SEC for Fiscal Year 2014 on Form 10-K which was signed by Powers. The 2014 Form 10-K stated:

> We anticipate that the Phase III trial will reach its first interim analysis for efficacy during 2015.
>
> ***
>
> "Information Arm" Outside the Phase III Trial
>
> In parallel with the Phase III trial of DCVax-L for GBM, we accepted a total of 55 patients into an "Information Arm" outside of the trial, who failed to meet the eligibility requirements for the trial. Most of these patients (51 of the 55) were actual or potential "rapid progressors" (patients in whom the brain cancer is already appearing to re-grow by the time the patient finishes the 6 weeks of daily radiotherapy and daily chemotherapy following surgical removal of the tumor). At least 19 of the 51 patients were confirmed as being clear rapid progressors, with such aggressive cancer that the brain tumors were already re-growing within weeks after the original surgery, and during the daily radiotherapy and chemotherapy. The rest of the 51 patients could not be classified as clearly, with today's imaging and other technology. All of the 51 patients were treated with the same DCVax-L product as in the Phase III trial, on the same treatment schedule as in the trial, at the same medical centers as in the trial, in the same time period as the trial, and the data were collected and maintained by the same Contract Research Organization (CRO) as is managing the trial. As we have reported, a significant extension of survival compared with expected survival times has been seen to date in these Information Arm patients, including the 19 confirmed rapid progressors.

81. The statements identified in paragraph 80 above were materially false and misleading

when made because: (a) the Phase III trial actually reached its first interim analysis for efficacy during late 2013, as the Company conceded at the time.  However, the Company either buried the results or declined to have the DSMB complete the efficacy analysis, a sure sign that the DCVax-L trial was not showing promising efficacy results; and (b) the reported "information arm" results were artificially inflated by the biased, open-label noncontrolled design of the study, and were further inflated by improper classifications that excluded certain "rapid progressors."  If appropriate classifications were used, even with the benefit of open-label biases, the "information arm" rapid progressors showed survival in line with standard of care, signifying no meaningful benefit from the addition of DCVax-L to the treatment regimen.

82.     On March 27, 2015, NW Bio issued a press release and published an investor presentation repeating the misrepresentations and omissions regarding the "information arm" described in paragraphs 71 and 80 above.

83.     On April 2, 2015, the Company took advantage of NW Bio's artificially inflated share price to raise $40 million by selling 5,405,405 shares of common stock to Woodford Investment Management LLP at $7.40 per share.

84.     On April 13, 2015, the Company inured an additional economic benefit from its inflated share price as an unrelated holder of $2.5 million in 5.0% senior convertible notes elected to convert those notes to equity, relieving the Company of debt and interest obligations.

**THE TRUTH IS REVEALED**

85.     In addition to the partial disclosures on June 19, 2014 and July 7, 2014 identified in paragraphs 65 to 67 above, investors learned of trial and efficacy problems related to DCVax-L when the FDA issued a clinical hold on further trial recruitment on August 21, 2015.  According to a press

release issued by NW Bio on that day, "new screening of patient candidates has been suspended while the Company prepares and submits certain information from the trial for regulatory review."

86.     Dr. Guarino explained that a clinical hold indicates serious problems that cannot be rapidly remedied: "A clinical hold for experimental drugs, biologics or medical devices is an order issued by FDA to the sponsor to hold a proposed clinical investigation or to suspend an ongoing investigation (CFR 312.42). FDA does not put a clinical hold on investigational studies unless there is a situation that cannot be rapidly remedied.     When the FDA issues a clinical hold it may or may not allow patients who are currently receiving the experimental therapy to continue treatment. If there is a question as to whether stopping treatment might jeopardize the safety of the patient, the FDA will generally let those patients continue their course of treatment."

87.     In response to the disclosure of the clinical hold on the only pivotal clinical trial for its leading DCVax-L therapy, NW Bio shares plummeted 22% on heavy volume to close at $6.96 per share on August 21, 2015. Share prices have not rebounded, and remain far below thei Class Period high of $12.24 per share.

## POST-CLASS PERIOD DEVELOPMENTS

88.     On August 25, 2015, NW Bio filed a Form 8-K with the SEC indicating that NW Bio noted in a Form 8-K filed four days later, on August 25, 2014, that it had been asked by investors for specific details regarding the halt and required update to regulators, but refused to provide that information:

> A shareholder inquiry also asked what information the Company is submitting to regulators. The Company's response noted that such submissions would not normally be discussed in the middle of a regulatory process or dialog, and that the Company plans to report when the process has been completed.

89.     To date, the Company continues to refuse to disclose to investors the specific information

conveyed to the Company by the FDA regarding the clinical hold, what information the FDA or other regulators demanded it compile, or the results of its interim efficacy review. The Company's continued obfuscation is further evidence of its pattern of hiding adverse facts so that it can mislead investors with partial, biased reports of trial developments.

90. On October 28, 2015, Phase V Research published a report on NW Bio entitled "*Northwest Biotherapeutics' house of cards is ready to collapse*." This report discussed at length efficacy problems in DCVax studies and Powers' misuse of her position at NW Bio to transfer corporate funds and equity to other struggling companies that Powers owned, including Cognate. In part, the report stated:

> In 2016, Northwest Bio will have been developing the DCVax dendritic vaccine for exactly 20 years. This bio-failure in-the-making exhibits all the obvious signs of a looming disaster: clinical trials stretching over decades, half a dozen trial amendments and extensions, lack of reliable results and publications, an utter deliberate mess in reporting on them, and most recently, a sudden shadowy halt to patient enrollment in the Phase 3 trial of the company's lead candidate. NWBO has used probably every trick in the book to prevent the inevitable end and announcing the results of its clinical trials, and for a good reason: as long as failure is not announced, the dream can live on and fresh money can be raised by NWBO which then feeds it to NWBO's CEO private companies. The lack of corporate governance has allowed NWBO's CEO, Chairperson and President Powers (former VP Global Finance at Enron) to unscrupulously use the company as her personal checking account to financially support her investment in NWBO and other private companies, mostly Cognate Bioservices, by transferring massive amounts of cash, shares and warrants to herself and companies she owns and controls. In addition, we believe NWBO has been involved in various undisclosed transactions with (i) Powers and her companies, (ii) at least one major shareholder and with (iii) its "independent director" Dr. Navid Malik. Phase Five's team analyzing NWBO was comprised of Phd's and analysts with strong medical background, together with financial experts with extensive background in uncovering fraudulent companies.

91. Shortly after the Phase V Research report, on November 22, 2015, it was reported that NW Bio director Navid Malik had been suspended from Cenkos Securities, where he was employed as a broker.

92.     On November 24, 2015, the Company's second largest shareholder, Neil Woodford, sent NW Bio's board a letter demanding that it establish an independent special committee to investigate claims about the governance and abuse of authority by Chairperson/President/CEO Powers.

93.     On December 8, 2015, NW Bio issued a press release announcing the retention of an outside firm to investigate allegations in the Phase V Research report.  To date, the Company has not disclosed the results of that investigation.

94.     On January 8, 2016, NW Bio issued a press release confirming that its pivotal DCVax-L trial remained "on a partial clinical hold in regard to new screening of patients."

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

95.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired NW Bio common stock during the Class Period (the "Class"); and were damaged thereby.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

96.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, NW Bio common stock was actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.   Record owners and other members of the Class may be identified from records maintained by NW Bio or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

97.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

98.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

99.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented and omitted material facts about the business, operations and management of NW Bio and its clinical trials for DCVax-L and DCVax-Direct;

- whether the Powers controlled NW Bio during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the price of NW Bio stock was artificially inflated during the Class Period because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

100.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

101.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- NW Bio securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased and/or sold NW Bio securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

102.    Plaintiffs will also rely, in part, on the presumption of reliance applicable to securities fraud cases stemming from omissions that was established by *Affiliated Ute Citizens of Utah vs. United States*, 408 U.S. 128 (1972), because the misrepresentations in this case stem primarily from omissions rather than false affirmative statements.

103.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## COUNT I

### (Against All Defendants For Violations of
### Section 10(b) And Rule 10b-5 Promulgated Thereunder)

104.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

105.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

106.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.   Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of NW Bio securities; and (iii) cause Plaintiffs and other members of the Class to purchase NW Bio securities at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

107.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for NW Bio securities and options.   Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about NW Bio's business prospects and clinical trials.

108.     By virtue of her positions at NW Bio, Powers had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive

Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth in that she failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to her.  All such knowledge, intent, and recklessness of Powers is imputed to NW Bio.   The aforesaid acts and omissions of Powers and NW Bio were committed willfully or with reckless disregard for the truth or the propensity to mislead investors.

109.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the CEO, President, Chairperson, Director, Principal Financial Officer, and Principal Accounting Officer, as well as largest beneficial shareholder of NW Bio, Powers unquestionably had full knowledge of the details of NW Bio's internal affairs.

110.    Powers is liable both directly and indirectly for the wrongs complained of herein. Because of her positions of control and authority, Powers was able to and did, directly or indirectly, control the content of the statements of NW Bio.  As the highest ranking officer and director of a publicly-held company, Powers had a duty to disseminate timely, accurate, and truthful information with respect to NW Bio's businesses, operations, clinical trials and prospects.   As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of NW Bio common stock was artificially inflated throughout the Class Period.   In ignorance of the adverse facts concerning NW Bio's business and clinical trials which were concealed by Defendants, Plaintiffs and the other members of the Class purchased NW Bio common stock at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

111.    During the Class Period, NW Bio common stock was traded on an active and efficient market.  Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of NW Bio common stock at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiffs and the other members of the Class known the truth, they would not have purchased said securities or would not have purchased them at the inflated prices that were paid.  At the time of the purchases by Plaintiffs and the Class, the true value of NW Bio stock was substantially lower than the prices paid by Plaintiffs and the other members of the Class.  The market price of NW Bio common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

112.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

113.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, upon the disclosure that the Company had disseminated false statements to the investing public and omitted material false information necessary to render their statements related to its clinical trials and vaccine candidates not misleading under the circumstances in which they were made.

## COUNT II

### (Violations of Section 20(a) of the
### Exchange Act Against The Individual Defendant)

114.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

115.    During the Class Period, as set forth above, Powers exercised complete control over NW Bio.  She held the top management and board positions, controlled the largest block of NW Bio stock, and controlled NW Bio's largest business partner.  Because of these facts, Powers knew the adverse non-public information alleged herein regarding NW Bio's clinical trials and vaccine candidates.

116.    As an officer and director of a publicly owned company, Powers had a duty to disseminate accurate and truthful information with respect to NW Bio's financial condition and results of operations, and to correct promptly any public statements issued by NW Bio that had become materially false or misleading.

117.    Because of her control and authority over NW Bio, Powers was able to, and did, control the contents of the various reports, press releases and public filings which NW Bio disseminated to investors during the Class Period concerning NW Bio's business operations, vaccine candidates and clinical trials.  Throughout the Class Period, Powers exercised her power and authority to cause NW Bio to engage in the wrongful acts complained of herein.

118.    Powers was a "controlling person" of NW Bio within the meaning of Section 20(a) of the Exchange Act.  In this capacity, as well as her individual capacity, she participated in the unlawful conduct alleged which artificially inflated the market price of NW Bio common stock.

119.    By reason of the above conduct, Powers is additionally liable pursuant to Section 20(a) of the Exchange Act for the violations committed by NW Bio.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.  Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representative;

B.   Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.   Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.   Awarding such other and further relief as this Court may deem just and proper.

<u>**DEMAND FOR TRIAL BY JURY**</u>

Plaintiffs hereby demand a trial by jury.

Dated:  February 12, 2016

**COHEN MILSTEIN SELLERS & TOLL PLLC**

_____/s/ Daniel S. Sommers_____
Steven J. Toll (D. Md. Bar No. 15824)
Daniel S. Sommers (D. Md. Bar No. 15822)
S. Douglas Bunch
1100 New York Ave. N.W.
West Tower, Suite 500
Washington, DC 20005
(202) 408-4600 (Telephone)
(202) 408-4699 (Fax)
stoll@cohenmilstein.com
dsommers@cohenmilstein.com
dbunch@cohenmilstein.com

*Liaison Attorneys for Lead Plaintiffs*

Joshua B. Silverman
**POMERANTZ LLP**
10 South LaSalle Street, Suite 3505
Chicago, IL 60603
(312) 377-1181 (Telephone)
(312) 377-1184 (Fax)
jbsilverman@pomlaw.com

Jeremy A. Lieberman
J. Alexander Hood II
**POMERANTZ LLP**
600 3rd Ave.
New York, NY 10016
(212) 661-1100 (Telephone)
(212) 661-8665 (Fax)
jalieberman@pomlaw.com
ahood@pomlaw.com

*Attorneys for Lead Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on February 12, 2016, I caused the foregoing to be served via the Court's CM/ECF system on all counsel of record in this matter who are registered on CM/ECF.

/s/ Daniel S. Sommers

Daniel S. Sommers
